# IN THE COURT OF APPEALS OF IOWA

No. 24-0853
Filed July 23, 2025

IN RE THE MARRIAGE OF JAY TRAVIS BREUER
AND ANGELA RAMSEY BREUER

Upon the Petition of
JAY TRAVIS BREUER,
      Petitioner-Appellant/Cross-Appellee,

And Concerning
ANGELA RAMSEY BREUER, n/k/a ANGELA R. RAMSEY,
      Respondent-Appellee/Cross-Appellant.
_____

      Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

      Jay Breuer appeals and Angela Breur cross-appeals from the district court's modification and contempt order. **AFFIRMED ON APPEAL AND CROSS-APPEAL; WRIT ANNULLED.**

      Tyler J. Johnston and Stephen J. Babe of Cordell Law, LLP, Des Moines, for appellant/cross-appellee.

      Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West Des Moines, for appellee/cross-appellant.

      Considered without oral argument by Greer, P.J., Ahlers, J., and Bower, S.J.*

      *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**BOWER, Senior Judge.**

Jay Breuer appeals an order modifying the legal-custody provisions of the decree dissolving his marriage to Angela Breuer. He claims the district court erred in granting Angela's request for sole legal custody of the parties' children. Angela cross-appeals, challenging the court's finding her in contempt of certain portions of the decree. Both parties contest the court's awards of trial attorney fees and request appellate attorney fees. Upon our review, we affirm on appeal and cross-appeal, and we annul the writ of certiorari.

## I.       Background Facts and Proceedings

Jay and Angela married in 2010. Their children, R.U.K.B. and R.M.B., were born in 2010 and 2013. The children have primarily resided with Angela since 2018. Jay petitioned for dissolution of the marriage in 2019. Prior to trial, the parties stipulated the issues relating to custody and physical care of the children. In 2021, the court entered a dissolution decree awarding them joint legal custody and physical care with Angela with Jay having visitation every other weekend from 6:00 p.m. Friday to 6:00 p.m. Sunday and four weeks during the summer. The court further ordered, "Unless otherwise agreed, Jay and Angela shall meet in Osceola, Iowa, to exchange the children before and after all parenting time because Jay lives in the Kansas City, Kansas area and Angela lives in Marion, Iowa."

In 2022, Angela moved to modify the decree, seeking sole legal custody of the children. To support her claim of a material and substantial change in circumstances since the decree was entered, she claimed:

        a. Due to [Jay's] harassing behavior of [R.U.K.B.'s] primary care physician, said physician will no longer provide care to the child forcing [Angela] to seek care elsewhere.

        b. Refusal of [Jay] to follow medical advice regarding medication for [R.U.K.B.] for ADHD despite advice from numerous medical professionals

        c. [Angela] has reached out to [Jay] regarding enrollment in multiple extra-curricular activities (swimming, flag football) and he refuses to allow the children to participate in said activities despite the fact that they do not interfere with his parenting time.

Angela further claimed, "The current schedule requires that the children leave school early two Fridays per month in order to be at the exchange time and location per the decree."  Finally, Angela maintained she "can offer superior care for the child[ren] as compared to [Jay]."

Meanwhile, Jay filed a contempt application based on assertions that Angela failed to follow several provisions of the decree.  Specifically, Jay claimed Angela: failed to provide him notice of the children's appointments (counts 1–5); failed to consult with him about medical decisions (counts 6–9); failed to provide information (counts 10–13); failed to follow the telephone-contact provision (counts 14–18); and used the children to communicate with Jay and failed to use Talking Parents (counts 22–24).[1]  The district court set the matters for a consolidated hearing.

Angela and Jay testified at the hearing.  The court received evidence of medical records for R.U.K.B., Talking Parents messages, and teacher reports.  The record also contains deposition transcripts from R.U.K.B.'s medical providers

---

[1] Jay also alleged that Angela disparaged Jay in front of the children in counts 19 through 21, but he withdrew those counts at trial.

and a report and deposition transcript from the court-appointed child and family reporter.

At the time of the hearing, Angela lived with the children in Marion, where she worked as a speech pathologist. Angela had been in a relationship with Justin for "[a]bout five years," and they have lived together for two and a half years. Justin's son, who is twelve years old, lives with them fifty percent of the time. The children have a "good" relationship with Justin and his son. Jay lives in Kansas City, Missouri, and he has a girlfriend. Jay works for the United States Naval Department and travels "[a]bout 80 percent of the time" for his work.

R.U.K.B. was twelve years old at the time of trial and in seventh grade. R.M.B. was ten years old and in fifth grade. Both children were generally reported to be happy, well-adjusted, and on track developmentally. The main point of contention between the parties was R.U.K.B.'s diagnosis of ADHD. Angela testified the medication prescribed to R.U.K.B. for her diagnosis was "tremendously beneficial" in treating her ADHD. The child also reported the medication helped her. Angela testified, however, that R.U.K.B. "has not been able to get the prescription medication that the doctors have said she needed because Jay has threatened the doctors." Specifically, Jay's threatening behavior was the reason three providers stopped treating R.U.K.B. Jay repeatedly told the child she was "a meth head" and "a druggie" for taking the medication, and he showed videos to R.U.K.B. about how the medication was bad for her.

Despite threatening providers and harassing the child and Angela, Jay never sought a second opinion as to R.U.K.B.'s treatment. Angela described Jay's actions when an appointment for R.U.K.B. took place:

> He doesn't show up.  And then whatever results we have, then he has a problem, and he changes what I need to do.  And then he has a complaint about that, and then I change and try to accommodate whatever his request is or what he's arguing against.  And then it's—he complains about that and harasses people, harasses me and the providers.

As an example, Angela described an incident in the summer of 2022 when she told Jay she was fine with R.U.K.B. "not taking medication."  Jay responded that Angela was "in contempt" because she knew the child "needs to be taking her medication all the time."  Angela reflected that R.U.K.B.'s medical provider "was shocked at Jay's switch of behavior."  In short, Angela believed "Jay is not thinking about their interest.  He has a vendetta against me, and he's just trying to make things difficult . . . just to create havoc in our lives."  She stated "every single interaction [with Jay] is shaming or threatening.  Money that I'm going to have to spend for court.  He's threatened that I'll lose my job because of jail time, and then the kids will basically not have a relationship with me."

Angela also testified about extracurricular activities—such as swimming lessons, flag football, cheerleading, roller skating, and summer camp—that Jay "blocked" despite the children wanting to participate.  Angela believed "promoting them doing what gives them joy, giving them an opportunity to try out sports in life, is in their best interest."  The children also missed other important events—such as back-to-school nights or birthday parties—because Jay refused to take them during his parenting time.

Angela resorted to minimizing her communications with Jay, which he interpreted as violating the decree requirements.  As Jay testified:

> And I think that's demonstrated in her just telling me about it, sending me a bill, and then not looking or not responding for two weeks later.

Like, that's not communicating. That's not coparenting. That's Angela telling me what she does with the kids after she did it. I have zero impact and have had zero impact in the decree.

Jay agreed that Angela had "been doing a lot better" lately; "[i]nformation isn't free-flowing, but it has gotten better after we filed [the contempt application]."

Following the hearing, the court granted Angela's request for sole legal custody, modified the exchange location for visitation,[2] and ordered that the children would not be taken out of school early for visitation unless the parties agreed. The court ordered that Jay's "[v]isitation and parenting time shall remain as set by the original decree." The court ordered Jay to pay Angela $10,000 in attorney fees for the modification action.

The court also found Angela in contempt on counts 1 through 13,[3] but declined to punish her for the contempt, and instead "agree[d] with Jay that a suspended jail sentence should be the proper form punishment to motivate Angela to follow the provisions of the decree." The court ordered Angela to pay Jay $5000 in attorney fees for the contempt action.

Jay appeals, and Angela cross-appeals. Jay challenges the court's decision to grant Angela sole legal custody and award of attorney fees to Angela for the modification action. Angela challenges the court's findings of contempt and

---

[2] Per the decree, the visitation exchanges were to take place in Osceola. The court found "[t]he current procedure interferes with and is detrimental to the children as they must leave school early on Fridays in order for Angela to transport them to the present exchange location in Osceola, Iowa." The court modified the decree to order the exchanges to take place in West Des Moines.

[3] The court dismissed the remaining counts upon finding "no proof of a willful violation by Angela beyond a reasonable doubt."

award of attorney fees to Jay for the contempt action. We will begin with Angela's cross-appeal, proceed to Jay's appeal, and then address the attorney-fee issues.

## II.     Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, which we review de novo. Iowa R. App. P. 6.907; *In re Marriage of Kisting*, 6 N.W.3d 326, 332 (Iowa Ct. App. 2024). While not binding, we give weight to the district court's findings of fact, especially on credibility determinations. *Kisting*, 6 N.W.3d at 332. In cases such as these, our overriding consideration is the best interests of the child. Iowa R. App. P. 6.904(3)(n).

Our review of a contempt action is by writ of certiorari. We treat Jay's notice of appeal as a petition for writ of certiorari. *See* Iowa R. App. P. 6.151(1). We review the district court's finding of willfulness relating to an allegation of contempt for substantial evidence. *Amro v. Iowa Dist. Ct.*, 429 N.W.2d 135, 140 (Iowa 1988).

## III.     Contempt Findings

Iowa Code section 598.23 (2020) states, "If a person against whom a . . . final decree has been entered willfully disobeys the order or decree, the person may be cited and punished by the court for contempt . . . ." Willfulness has been described as "conduct that is intentional and deliberate with a bad or evil purpose, or wanton and in disregard of the rights of others, or contrary to a known duty, or unauthorized, coupled with an unconcern whether the contemner had the right or not." *Amro*, 429 N.W.2d at 140 (citation omitted).

In counts 1 through 5, Jay alleged in relevant part that Angela willfully "scheduled counseling appointments, dentist appointments, and doctor appointments without informing and/or giving notice before the appointment" in

violation of the provision of the decree stating that "[t]he parents shall consult with each other regarding . . . medical care, extracurricular activities, and all other matters related to the children." In counts 6 through 9, Jay alleged in relevant part that Angela willfully "put the parties' daughter on ADHD medication without discussing or consulting with [Jay], and the child remains on the medication, despite [Jay's] disagreement" in violation of provision of the decree requiring the parties to "participate equally in . . . decisions affecting the children's . . . medical care." In counts 10 through 13, Jay alleged in relevant part that Angela willfully refused to provide information concerning the children's medical, educational, and extracurricular activities in violation of several provisions of the decree.

Angela claims "there is insufficient evidence to support that [she] intentionally and willfully violated the court's order" on the grounds alleged by Jay. We disagree. On this record, we find substantial evidence supports the contempt findings. True, Angela assumed responsibility for scheduling medical appointments and other activities and taking the children. But she knew Jay wanted more information regarding the appointments. *But see, e.g.*, *In re Marriage of Raper*, No. 14-1003, 2015 WL 2406784, at *5–6 (Iowa Ct. App. May 20, 2015) (reversing finding of contempt where the father "never mentioned to [the mother] he wanted more information regarding the [children's] appointments" and the mother's "conduct was in keeping with the practice of the parties during their marriage and during the eleven years since the divorce"). Angela conceded that she had not been forthcoming with information at times and that she had made decisions without consulting Jay. Angela was well-aware of such actions were prohibited under the terms of the decree, because as she testified, Jay regularly

reminded her of the decree provisions. And even if Angela's actions were understandable considering the circumstances caused by Jay's troubling behavior, the fact remains that substantial evidence supports the district court's finding that Angela's noncompliance with the decree constituted willful disobedience. We affirm the findings of contempt.

## IV. Legal Custody

Jay claims the court erred in modifying legal custody from joint to sole legal custody in favor of Angela. "To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of the evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change." *In re Marriage of Winnike*, 497 N.W.2d 170, 173 (Iowa Ct. App. 1992). "The party seeking modification of a decree's custody provisions must also prove a superior ability to minister to the needs of the children." *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016) (citation omitted).

Jay contends Angela failed to prove a substantial change in circumstances or that it was in the children's best interests to grant her sole legal custody. According to Jay, "the parties are able to cooperate regarding those matters affecting the children and agree on many fundamental decisions affecting the children's lives," and "[t]o the extent that the parties have not able to cooperate, this has been with respect to one matter: R.U.K.B. and the topic of ADHD." But Jay claims Angela was the cause for their lack of cooperation, pointing out that she "did not seek to cooperate" with him on various occasions relating to the child's medical care. For example, Jay states Angela "unilaterally scheduled and took

R.U.K.B. [to] be seen for possible ADHD" and "unilaterally sought and obtained an ADHD Adderall prescription for R.U.K.B."

Jay acknowledges that the child "was formally diagnosed with ADHD" in spring 2022. He maintains that he does "not see any need for R.U.K.B. to be prescribed medication for her mild ADHD," but "[i]t is clear that Angela is not focused on alternatives to ADHD medication." But as the district court observed, "Jay has failed to present any medical evidence supporting his position on the proper care and treatment for R.U.K.B. including any danger to the child from the use of medications." The court further found, "The attitude and conduct by Jay toward the treatment providers was threatening and non-productive and had little to do with R.U.K.B.'s health."

Although Jay characterizes the conflict between the parties on the issue of their daughter's treatment as a lack of cooperation, the record clearly shows the parties' inability to agree on important matters pertaining to R.U.K.B.'s health has been a detriment to the child. As the district court found:

> Jay has acted in a manner since the entry of the original decree detrimental to the health and welfare of the children, in particular R.U.K.B. He has contradicted, obstructed, and ignored the medical and therapeutic advice of the health professionals involved with R.U.K.B. His attitude toward R.U.K.B.'s ADHD and the recommended treatment is totally contrary to the child's health and well-being. It is due more to the anger he has toward Angela than having anything to do with what is the proper treatment for R.U.K.B.

We concur with the court that Jay's actions and behaviors surrounding R.U.K.B.'s health implicate the parties' ability to continue in a joint legal custody arrangement and act in the best interests of the children. *See Harris*, 877 N.W.2d at 443 (finding "the discord between the parents on the daughter's need for

treatment and the suitability of the treatment [the mother] has obtained for her is another factor militating against the continuation of the joint custodial arrangement between [the parents]").

We also find Angela's request for modification is supported by the parties' animosity toward each other and inability to communicate civilly about other parenting matters. Indeed, the child and family reporter noted that R.M.B. was aware his parents "fight about visits." And R.U.K.B. knew her parents "don't like each other" and she felt "in the middle of them" at times. She was upset about Jay telling her that Angela "might go to jail." *Id.* at 441 (considering the custody evaluator's report "that the daughter is troubled by her parents' behavior and wishes her parents would 'get their act together'"). The children also expressed frustration about Jay reading their communications with Angela and Justin. As the child and family reporter noted, "The parties have also recorded Facetime conversations and have directed the children to delete messages placing the children squarely in the middle of the parties' continuing conflict." These facts and circumstances support a finding that the parties are no longer able to coparent in any meaningful sense and militate against joint legal custody. *See In re Marriage of Rolek*, 555 N.W.2d 675, 677 (Iowa 1996) ("When, following a dissolution decree providing joint custody, the actions of the parties indicate that they are no longer able to cooperate, a modification of the custody status is appropriate.").

Jay also briefly touches on the issue of extracurricular activities but states it "was not a serious factor considered by the district court." Upon our review of the record, we observe that the children's social and extracurricular activities have been a source of contention between the parties. *See Harris*, 877 N.W.2d at 443–

44 ("We find the parents' unwillingness to cooperate in the identification of extracurricular activities for the children is further evidence of the failure of the joint physical care relationship in this case."). Indeed, both children voiced frustration to the child and family reporter about being pulled from activities by Jay, either for phone calls or visits.[4]

The district court engaged in a thorough review of the evidence presented at trial, including testimony from the parties and other witnesses. The court determined "Angela's request for a modification of the decree is well supported by the evidence. There has been a material and substantial change of circumstances that the conditions since the decree was entered that the children's best interests make it expedient to make the requested change." We concur.

The court further found the children's interests would be best served by Angela having sole legal custody. In reaching this conclusion, the court considered Jay's actions that were "detrimental to the health and welfare of the children," including his obstruction to health care for R.U.K.B., which was contrary to the advice provided by professional medical and therapy providers in this case. *See, e.g.*, *id.* at 443 (noting that even if the father's "disapproval of the . . . use of the medication for the daughter is sincere, we credit the testimony of [the mother] and [the treating physician] who testified that the daughter's functioning has improved during her course of treatment with the drug"). The court also considered the emotional trauma and embarrassment Jay caused to R.U.K.B. by his conduct and statements toward her, finding his behavior "abusive, traumatizing and certainly

---

[4] We are hopeful the modifications ordered by the court will help alleviate those issues.

not in the child's best interests." In short, the court concluded, "Jay's love of the children, which the Court has no doubt, does not translate to good parenting."

The court's evaluation of relevant factors was thorough, and its findings are supported by the record. We conclude Angela met her burden to show a substantial change in circumstances and a superior parenting ability, and we affirm the district court's decision to modify the legal-custody provisions of the parties' dissolution decree.

## V.     Trial Attorney Fees

As noted above, the court ordered Jay to pay Angela $10,000 in attorney fees in the modification action and Angela to pay Jay $5000 in attorney fees in the contempt action. The parties challenge these respective awards.[5]

In a dissolution modification proceeding, the court "may award attorney fees to the prevailing party in an amount deemed reasonable." Iowa Code § 598.36 (2022). "[A]n award of attorney fees rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *In re Marriage of Francis*, 442 N.W.2d 59, 67 (Iowa 1989). Under these facts and circumstances, we do not find the court abused its discretion in ordering Jay to pay toward Angela's attorney fees.

An award of attorney fees in an action for contempt of a dissolution is also discretionary. *See* Iowa Code § 598.24 (stating "the costs of the [contempt] proceeding, including reasonable attorney's fees, may be taxed against that

---

[5] Jay also claims the court should have awarded him trial attorney fees in the modification action. "But because [Jay] was not the prevailing party, he was not entitled to fees under Iowa Code section 598.36." *In re Marriage of Price*, No. 24-0258, 2025 WL 403804, at *4 (Iowa Ct. App. Feb. 5, 2025).

party"). We have declined to overturn the court's contempt findings, and we cannot say the court abused its discretion in its award of attorney fees. *See Felton v. Iowa Dist. Ct.*, No. 21-1398, 2023 WL 1809820, at *6 (Iowa Ct. App. Feb. 8, 2023).

## VI. Appellate Attorney Fees

Both parties request an award of appellate attorney fees. An award of appellate attorney fees is not a matter of right but rests within the appellate court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). The court considers "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005) (citation omitted). In consideration of these factors, we decline to award appellate attorney fees to either party.

## VII. Conclusion

We affirm the district court's modification and contempt order, and we annul the writ of certiorari. Costs on appeal are assessed equally to each party.

**AFFIRMED ON APPEAL AND CROSS-APPEAL; WRIT ANNULLED.**